### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | |
|---|---|
| In re: | ) |
| | ) **Civil No. 3:15-cv-1506 (AWT)** |
| EDWARD J. WATERS, | ) |
| | ) |
| _____Debtor._____ | ) (Withdrawn Proceedings |
| EDWARD J. WATERS, | ) Bankruptcy Ct. Case No. |
| | ) 99-31833 and Bankruptcy |
| | ) Ct. Adv. No. 05-3054) |
| Plaintiff, | ) |
| v. | ) |
| | ) (Related case: 3:15-cv-1791 |
| | ) (AWT)) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| _____Defendant._____ | ) |

### <u>RULING ON MOTIONS FOR SUMMARY JUDGMENT</u>

The United States of America (the "United States"), on behalf of the Internal Revenue Service (the "IRS"), has filed two motions for summary judgment: the United States' Motion for Summary Judgment on 1998 Tax Issues ("Motion Re 1998 Tax Determination"), ECF No. 25, and the United States' Motion for Summary Judgment on Issues Remaining in Withdrawn Adversary Proceeding ("Motion Re Adversary Issues"), ECF No. 26. In the former, the United States seeks a determination that the debtor, Edward J. Waters ("Waters"), is liable for individual income tax and accrued interest for the 1998 tax year. In the latter, the United States seeks a determination that the IRS did not violate the automatic stay provisions of the Bankruptcy Code by withholding overpayments claimed by Waters with

respect to certain tax years. For the reasons set forth below, both motions are being granted.

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Waters has not set forth facts he contends are in dispute in response to the United States' motions for summary judgment and, as a result, is not in compliance with Local Rule of Civil Procedure 56(a)(2).[1] Nor has he presented evidence to controvert the assertions in the United States' motions.[2] Thus, all facts set forth in the United States' Rule 56(a)(1) statements are deemed admitted by Waters. See Dusanenko v. Maloney, 726 F.2d 82 (2d Cir.

---

[1] The court notes that Waters, proceeding pro se, is a licensed attorney in New York and received two copies of the Notice to Self-Represented Litigant Concerning Motion for Summary Judgment As Required by Local Rule of Civil Procedure 56(b) (ECF Nos. 25-6 and 26-3), which details the procedures to follow when filing an opposition to a motion for summary judgment and the consequences of failing to do so.

[2] Local Rule of Civil Procedure 56(a)(2) provides that:

> (i) A party opposing a motion for summary judgment shall file and serve   .   .   . a document entitled "Local Rule 56(a)2 Statement of Facts in Opposition to Summary Judgment," which shall include a reproduction of each numbered paragraph in the moving party's Local Rule 56 (a)1 Statement followed by a response to each paragraph admitting or denying the fact and/or objecting to the fact as permitted by Federal Rule of Civil Procedure 56(c). . . . All denials must meet the requirements of Local Rule 56(a)3. A party shall be deemed to have waived any argument in support of an objection that such party does not include in its memorandum[.]

> (ii) The Local Rule 56(a)2 Statement must also include a separate section entitled "Additional Material Facts" setting forth in separately numbered paragraphs meeting the requirements of Local Rule 56(a)3 any additional facts, not previously set forth in responding to the movant's Local Rule 56(a)1 Statement, that the party opposing summary judgment contends establish genuine issues of material fact precluding judgment in favor of the moving party[.]

1984) (facts set forth in the movants' statement of undisputed facts were properly deemed admitted given opposing party's failure to present evidence to controvert any assertions in the movants' papers and failure to file a local rule statement of disputed facts). The material facts are set forth below.

On December 19, 1997, Waters filed a petition under Chapter 13 of the Bankruptcy Code, which was transferred between divisions of the United States Bankruptcy Court in 1999. Waters listed the IRS and the State of Connecticut Department of Revenue Services (the "CDRS") as his only personal creditors in the schedules to his Chapter 13 petition. The IRS filed an initial proof of claim on February 4, 1998 in the amount of $924,682.59 for the 1986 through 1996 prepetition tax years.

In 2000, Waters filed a separate Chapter 11 case. Subsequently, Waters, the IRS and the CDRS entered into a stipulation (the "Stipulation"), see In re Waters, No. 99-31833, ECF No. 180, dated July 16, 2001, that was entered as an order of the Bankruptcy Court and required Waters to dismiss his Chapter 11 case, convert his Chapter 13 case to a Chapter 11 case, sell one of his residences, and put in escrow a portion of the proceeds from the sale of that property (the "Escrowed Funds"). Id. at 5-7. The Stipulation also required Waters to have a tax attorney of his choosing prepare his late 1993 through 2000 personal tax

-3-

returns, plus any quarterly personal income tax return due for 2001, and to use the Escrowed Funds to pay the tax liabilities for 1993 through 2000 and any estimated income tax due for 2001. Id. at 8. The Stipulation provided further that any administrative tax expense of the bankruptcy estate was to be paid from the Escrowed Funds, including prepetition and post-petition taxes incurred by Waters' bankruptcy estate.[3] Pursuant to the Stipulation, the Chapter 13 case was converted to a Chapter 11 case, the residence was sold, and a portion of the sale proceeds -- $1,287,206 -- was placed into escrow with Waters' bankruptcy attorney.

In late 2001 and early 2002, Waters, through his tax counsel, filed his 1993 through 2000 federal and state tax returns. The taxes initially reported as due on these returns were paid from the Escrowed Funds pursuant to an agreed order of the Bankruptcy Court (the "Tax Payment Order"), dated April 25, 2002. The Tax Payment Order provided, in relevant part:

> [C]ounsel for the Debtor is hereby authorized to make a distribution to the [IRS] of $529,520.62 . . . for the payment by [Waters] of the federal taxes, penalties and interest owed for his tax years 1993 through 2000, and the payment of his estimated taxes for 2001; provided however, that the Court notes that the [IRS] represented . . . that it has calculated these amounts based on

---

[3] Although the plaintiff initially contested whether the Stipulation contemplated using the Escrowed Funds to pay the estate's tax liabilities as well as his own, the Bankruptcy Court ultimately held, several years later, that the language of the Stipulation mandated payment of the estate's prepetition and post-petition tax liabilities using the Escrowed Funds. In re Waters, No. 99-31833, 2010 WL 2940858 (Bankr. D. Conn. July 23, 2010).

> returns filed by [Waters] which have not yet been
> reviewed or assessed by the [IRS] and reserves its right
> to complete its assessment process which may change the
> amount due; and it is further . . .
>
> ORDERED that the IRS agrees that the payment by [Waters]
> of his taxes, penalties and interest shall not
> constitute a waiver by him of the right to file a claim
> for a refund of any such penalties and to contest the
> assessment, validity or appropriateness of such
> penalties[.]

Tax Payment Order at 1-2, In re Waters, No. 99-31833, ECF No. 247.

The Tax Payment Order also provided for a distribution of

$130,277.99 to the CDRS for taxes, penalties, and interest, and in

addition, a distribution of $128,000 to Waters individually. Id.

It reserved the remaining Escrowed Funds -- approximately $360,000

-- pending further developments and continued litigation.

Not long after the tax returns were filed and taxes paid from

the Escrowed Funds, Waters filed amended tax returns that claimed

refunds for most of the taxes that were paid pursuant to the Tax

Payment Order. The IRS examiner who was initially assigned to

review the amended returns, who was unaware of the Tax Payment

Order, agreed with many of the adjustments that Waters claimed on

the amended returns and scheduled overpayments on the tax accounts

maintained on the IRS's computer systems for tax years 1993, 1994,

1996, 1997, 1999 and 2000, and reduced the amount of tax still

owed by Waters for tax year 1995. Before any refund was made,

however, the IRS froze the refunds and audited the returns. During

-5-

its consideration of the amended returns, the IRS refused to refund the claimed overpayments in order to preserve a right to setoff the claimed overpayments against other tax liabilities that were in dispute, including Waters' 1991 and 1995 taxes and his bankruptcy estate's 1998 and 2001 taxes.

It is undisputed that, under the Stipulation, the Escrowed Funds were being treated as Waters' personal post-petition earnings and were therefore not property of the bankruptcy estate. See United States' Local Rule 56(a)1 Statement for Mot. Re Adversary Issues ("Statement of Facts Re Adversary Issues") at 3, ECF No. 26-1. Thus, it is also undisputed that the claimed overpayments were paid with funds traceable to Waters' post-petition earnings -- specifically proceeds from the sale of a residence that was secured, in part, by a mortgage obtained through Waters' post-petition income -- and were understood by both parties to constitute post-petition obligations. See Mem. in Support of Mot. Re Adversary Issues ("Mem. Re Adversary Issues") at 10 and 11, ECF No. 26-2 (referring to the claimed overpayment as a "postpetition overpayment" and a "postpetition obligation"); Reply Re 1998 Tax Liability Determination and Adversary Proceeding ("Combined Reply") at 15, ECF No. 31 (describing the "alleged tax refund obligations here" as "postpetition"); Adv. Compl. at ¶ 10,

<u>Waters v. United States</u>, Adv. No. 05-3054, ECF No. 1 ("Any tax refunds due the Debtor are post-petition tax refunds[.]").

In December 2003 Waters filed a contested matter motion with the Bankruptcy Court seeking a distribution to himself from the remaining Escrowed Funds because of the IRS's "refus[al] to pay the[] income tax, penalties, and interest refunds . . . due to [Waters]," and its "assert[ion of] a right to 'setoff' these funds" against other taxes that were disputed to be owed by Waters and the estate. Debtor's Mot. for Further Distribution to Him of Proceeds of Sale of His Residence, <u>In re Waters</u>, No. 99-31833, ECF No. 381. On December 22, 2003, the United States responded, stating that the IRS "ha[d] not made a final determination as to the federal tax refund figure, if any, which it will allow," and that therefore Waters' motion was "premature." U.S.'s Obj. to Debtor's Mot. at 4, <u>In re Waters</u>, No. 99-31833, ECF No. 385. This motion was held in stasis for several years by the Bankruptcy Court until this court withdrew the reference. See Order Re Mot. to Withdraw Bankr. Reference, No. 3:10-mc-14, ECF No. 5.

After completing its audit of the amended returns for 1993 through 2000, the IRS maintained its freeze on overpayments that it believed would be sufficient to satisfy Waters' 1991 and 1995 tax liabilities. At that time, the 1991 and 1995 tax liabilities

were the only ones the IRS believed were owed by Waters personally[4]. It is undisputed that the IRS did not seek prior approval from the Bankruptcy Court to put in place or maintain the freeze with respect to a refund of Waters' claimed overpayments.

On October 4, 2004, Waters filed a Motion Under 11 U.S.C. § 362 and § 105: Requesting Court to Find IRS in Willful Violation of Stay by Withholding Post-Petition Tax Refunds Due Debtor, In re Waters, No. 99-31833, ECF No. 437, seeking, inter alia, to have the IRS release and pay his claimed post-petition refunds. The United States took the position that the relief sought required the filing of an adversary complaint under Bankruptcy Rule 7001 and Waters agreed to withdraw the motion without prejudice.

Meanwhile, on March 10, 2004, the Chapter 11 case was converted to a Chapter 7 case and a trustee (the "Chapter 7 Trustee") was appointed. On October 12, 2004, the IRS erroneously refunded the excess of the alleged overpayments (i.e., the refund amounts in excess of the 1991 and 1995 tax liabilities) to the Chapter 7 Trustee, based on an incorrect understanding that the source of the excess amounts, i.e. the Escrowed Funds, was property of the bankruptcy estate under 11 U.S.C. § 541. The IRS filed suit to recover the refunds, arguing that the refunds should not have

---

[4] A dispute remained at that time about whether the Stipulation mandated that the Escrowed Funds be used to pay the bankruptcy estate's tax liabilities too.

been issued in the first place, and also that, assuming the refunds were correctly issued, the refunds should have gone to Waters, not the Chapter 7 Trustee, because the taxes had been paid out of Waters' post-petition income. See Compl., <u>United States v. Richard Coan, Chapter 7 Trustee</u>, No. 3:06-cv-1599 (AWT), ECF No. 1. The IRS later recovered these funds with a judgment agreed to by the Chapter 7 Trustee. <u>See</u> Agreed J. In Lead Case, <u>United States v. Richard Coan, Chapter 7 Trustee</u>, No. 3:06-cv-1599 (AWT), ECF No. 68.

In March 2005, Waters filed an adversary complaint in the Bankruptcy Court, <u>Waters v. United States</u>, Adv. No. 05-3054, seeking, <u>inter alia</u>, damages for the IRS's alleged willful violation of the automatic stay provisions in 11 U.S.C. § 362 and for alleged violations of the Internal Revenue Code and/or due process.[5] The adversary complaint's allegations of a stay violation were premised on the IRS's withholding of the refunds Waters claimed for tax years 1993, 1994, 1996, 1997, 1999 and 2000. On May 19, 2005, the United States moved to dismiss the complaint, arguing that the allegations did not amount to a stay violation

---

[5] The United States agreed that Waters' adversary complaint could be treated as alternatively claiming a discharge violation under 11 U.S.C. § 524. <u>See</u> Statement of Facts Re Adversary Issues at 10; Combined Reply at 6. However, as discussed below, the court is not considering this theory of liability as it was not presented in Waters' response to the order to show cause and was not argued by Waters in opposition to the motions for summary judgment.

-9-

and that the Bankruptcy Court lacked jurisdiction over the claims that it violated the Internal Revenue Code and/or due process. The United States conceded that the claim for damages for an alleged willful violation of the automatic stay was within the Bankruptcy Court's jurisdiction. On December 13, 2005, the Bankruptcy Court denied the United States' motion to dismiss without prejudice to reconsideration, and on February 21, 2006 it stayed the adversary proceeding indefinitely.

Meanwhile, on May 24, 2005, a discharge was granted in the Chapter 7 case, which terminated the automatic stay except as to acts against the property of the estate. As a result of the discharge, the United States released the withheld overpayments, credited them to the 1991 and 1995 tax claims against Waters, and filed a Notice of Having Effected Certain Setoffs and Statement of Impact on Remaining Liabilities (the "Notice of Setoffs"), Waters v. United States, Adv. No. 05-03054, ECF No. 32, in the adversary proceeding. The Notice of Setoffs explained that the IRS's only remaining prepetition claims were for the 1991 and 1995 tax years. It further explained that, in mistakenly issuing the refunds to the Trustee in 2004, it had held back funds to cover the remaining 1991 and 1995 tax liabilities. These funds continued to be withheld until the granting of the discharge terminated the automatic stay. The Notice of Setoffs then described the setoffs made after the

granting of the discharge, including the IRS crediting $54,765.10 of the withheld funds to Waters' 1991 liabilities from a combination of his 1996 and 1997 overpayments and crediting $22,006.88 to Waters' 1995 tax liabilities from a combination of his 1997 and 1999 overpayments.

With respect to the Motion Re 1998 Tax Determination, Waters filed a Form 1040, U.S. Individual Income Tax Return for the 1998 tax year (the "1998 Return") on February 22, 2002. The 1998 Return reported a total tax owed of $56,803, which was subsequently paid from the Escrowed Funds pursuant to the Tax Payment Order. Soon thereafter, Waters filed a Form 1040X, Amended U.S. Individual Income Tax Return for the 1998 tax year (the "Amended 1998 Return"). The adjustments made by Waters in the Amended 1998 Return claimed to reduce the total tax owed for that year from $56,803 to $17,172 and claimed the difference, $39,631, as a refund owed to Waters. The claim for a $39,631 refund was initially allowed by the IRS, and an overpayment in that amount was posted to Waters' 1998 tax account. Before a refund check was issued to Waters, however, the IRS froze the refund, refused to disburse funds in order to preserve its right to setoff the claimed overpayment against Waters' disputed tax liabilities, and audited the Amended 1998 Return.

-11-

On February 22, 2005, the IRS issued a Notice of Deficiency to Waters with respect to the his 1998 tax liabilities. After making several adjustments to the Amended 1998 Return, the IRS asserted that the total corrected tax was $90,351 and there was a remaining tax deficiency of $73,179 (which accounted for the $17,172 that remained assessed based on the Amended 1998 Tax Return). On December 5, 2005 (the "Deficiency Determination Date"), a delegate of the Secretary of the Treasury made assessments against Waters for additional federal income tax for the 1998 year in the amount of $93,372.98, which consisted of tax owed in the amount of $73,179, a 25% late filing penalty in the amount of $18,294.75, and accrued interest in the amount of $38,488.73. These assessments exceeded the payment of $98,990.82 that was made in 2002 from the Escrowed Funds pursuant to the Tax Payment Order, leaving an owed balance of $53,728.39 (the "Underlying Tax Deficiency") as of the Deficiency Determination Date.

Meanwhile, in September 2005 the IRS filed a contested matter motion pursuant to 11 U.S.C. § 505, In re Waters, No. 99-31833, ECF No. 477, to determine the 1998 and 2001 tax liabilities of Waters and his bankruptcy estate in order to collect taxes from the Escrowed Funds pursuant to the Stipulation. Through a series of decisions, the 2001 tax liabilities of Waters and the estate

have been adjudicated. A determination of Waters' 1998 tax liabilities remains.

On August 25, 2015, the United States moved, with the agreement of Waters, for this court to withdraw the reference with respect to the determination of Waters' 1998 tax liabilities and the adversary complaint. See Unopposed Mot. of United States to Withdraw Reference Respecting (1) Adv. No. 05-03054, and (2) 1998 Tax Determination, ECF No. 1. On October 14, 2015, this court issued an order, pursuant to 28 U.S.C. § 157(d), withdrawing the reference to the Bankruptcy Court with respect to these issues. See Order Withdrawing Reference, ECF No. 4.

On June 10, 2016, the court issued a scheduling order requiring Waters to file, inter alia, position statements regarding the issues he contended needed to be resolved with respect to both contested matters. Waters did not file position papers, nor did he file a motion requesting additional time to file them. On August 18, 2016, the court issued an order to show cause why, inter alia, default judgment should not be entered against him with respect to the 1998 tax liabilities in the amount assessed by the IRS and why his adversary complaint should not be dismissed for failure to comply with the scheduling order. See Order to Show Cause, ECF No. 18. On September 6, 2016, Waters filed

-13-

his response to the order to show cause. With respect to the
determination of his 1998 tax liabilities, he explained:

> Following the entry of the scheduling order, Waters
> discovered that the 1998 information that was
> ordered was impossible for him to provide within
> the 4 week period. . . .

> The impossibility facing Waters with respect to the 4
> week response period is that he did not have these 1998
> returns since they were put in storage over ten years
> ago by his accountants and that his Tax Counsel was on
> vacation to Southeast Asia at this time. . . .

> [W]ithout his Tax Counsel, the above 1998 tax returns
> cannot be understood by Waters in attempting to
> reconstruct them. . . .

> Waters thought he would have to wait for the return of
> his Tax Counsel to find these returns, or to request
> Attorney Sklarew to assist him in this regard. . . .

> Waters did not understand that the proper procedure
> under these circumstances regarding a scheduling order
> was to file a Motion requesting an extension of time for
> their return and not to wait for his Tax Counsel and
> Attorney Sklarew to return.

Debtor's Response to Order to Show Cause ("Debtor's Response") at
2-3, ECF No. 19. With respect to the adversary complaint, Waters
stated:

> It is now very clear that the IRS issued tax refunds in
> excess of $200,000 to the Debtor for prepetition tax
> years 1988 thru 2000, which were intercepted without a
> single dollar of tax liability outstanding, and
> thereafter held until final determinations of tax were
> made, having been paid from Debtor's postpetition
> earnings. . . .

> During the Chapter 13 phase of the case, all tax returns
> 1988 thru 1996 were deemed prepetition [petition filing

l2/19/l997], and tax years 1998 thru 2000 were deemed postpetition administrative claims. Upon conversion of the case in 2001 to a case under Chapter 11, the prepetition tax claims included all claims thru 2000 under ll U.S.C. 348(a) and (d). Consequently[,] when the Debtor paid his tax claims 1995 thru 2001 following the Stipulation . . . , he paid them from his postpetition earnings for prepetition claims. The tax refunds were prohibited setoffs under 11 U.S.C. 362.

Id. at 4.

On October 4, 2019, after concluding that entering default judgment against Waters for the 1998 tax liabilities and dismissal of the adversary complaint was not in the interest of justice, the court entered a revised scheduling order precluding Waters from raising in any subsequent briefing any factual or legal contention that he did not set forth in his response to the order to show cause. See 10/4/2019 Revised Scheduling Order, ECF No. 22.

The following month, the United States filed its Motion Re 1998 Tax Determination, seeking a determination that Waters is liable for $53,728.39 plus interest that has continued to accrue since the Deficiency Determination Date. The Department of Justice, Tax Division's computer program for computing interest on federal tax determined this amount to be $101,634.49 as of December 31, 2019.

The United States also filed the Motion Re Adversary Issues, seeking a determination that the IRS did not violate the automatic stay provisions of 11 U.S.C. § 362(a) and that any other remaining

-15-

issues with respect to the adversary complaint are barred by the Revised Scheduling Order and/or are beyond the jurisdiction conferred by 28 U.S.C. § 1334. The court agrees that all other legal contentions raised by Waters in his oppositions to the United States' motions are barred by the Revised Scheduling Order. Therefore, with respect to the Motion re Adversary Issues, Waters is limited to the theory of liability articulated in his response to the order to show cause, i.e. that he is entitled to damages because of the United States' alleged willful violation of automatic stay provisions of the Bankruptcy Code. No other theories of liability are being considered by the court.

## II.   LEGAL STANDARD

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994). When ruling on a motion for summary judgment, the court may not try issues of fact, but must leave those issues to the jury.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987). Thus, the trial court's task is

"carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." Id. at 248.

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Delaware & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)). Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion. Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture is insufficient to defeat a motion for summary judgment." Stern v. Trustees of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997) (internal

-17-

quotation marks omitted) (quoting Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir. 1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which [a] jury could reasonably find for the [nonmovant]." Anderson, 477 U.S. at 252.

Finally, the nonmoving party cannot simply rest on the allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists.  See Celotex Corp., 477 U.S. at 324. "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," Weinstock, 224 F.3d at 41, if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, who must "demonstrate more than some metaphysical doubt as to the material facts, . . . [and] must come forward with specific facts showing that there is a genuine issue for trial." Aslanidis v. U.S. Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993)(quotation marks, citations and emphasis omitted). Furthermore, "unsupported allegations do not create a material issue of fact." Weinstock, 224 F.3d at 41; see also BellSouth Telecomms., Inc. v. W.R. Grace & Co., 77 F.3d 603, 615 (2d Cir. 1996) ("[I]t is insufficient for a party opposing summary judgment merely to assert a conclusion without supplying

-18-

supporting arguments or facts."). If the nonmovant fails to meet this burden, summary judgment should be granted.

## III.  DISCUSSION

### A. <u>Motion Re 1998 Tax Determination</u>

With respect to the Motion Re 1998 Tax Determination, the United States seeks:

> [A] determination that there was no separately taxable bankruptcy estate during 1998 . . . and that Mr. Waters is liable for individual income tax, penalties and interest for the 1998 calendar year in the amount of $101,634.49 as of December 31, 2019, plus interest accruing thereafter at federal tax underpayment rates (as specified in 28 U.S.C. § 1961(c)).

Mot. Re 1998 Tax Determination at 1. In his opposition, Waters agrees that the court "should partially grant the [United States'] motion and enter judgment against [him] for the deficiency determined by the IRS amounting to $53,940.39 . . . at the time of the deficiency." Re: U.S.' Mot. for Summ. J. On 1998 Tax Issues ("Debtor's Opp'n to 1998 Tax Determination") at 2, ECF No. 27. However, Waters argues that "the court should deny any judgment that [he] owes additional penalties and interest until the IRS proves these are owed." <u>Id.</u>

Because Waters concedes the amount of underlying tax liability as of December 5, 2005, <u>i.e.</u>, $53,940.39, and does not challenge the United States' legal arguments on which this deficiency calculation is based, the sole contested issue with

respect to this motion is Waters' liability for the assessed interest on the principal amount of the tax deficiency.

Waters states that, instead of the underlying tax deficiency as of December 5, 2005, i.e., $53,940.39, "the IRS now asks for a deficiency determination of $101,634.49 . . . which the IRS states includes penalties and interest charges up to the present time for which no evidence is offered, and which is opposed." Id. at 2. He argues that no additional computations for penalties and interest should be determined "without proof of liability."[6] Id.

The United States maintains that "Waters is conflating the deficiency in tax principal with assessed additions to tax that include certain penalties and interest that are not part of the deficiency" and that have continued to accrue since the Deficiency Determination Date. Combined Reply at 8. The court agrees.

The United States has shown that these accruals are reflected in the Account Transcript, a product of the Internal Revenue Service that details all transactions regarding the plaintiff's

---

[6] In his opposition to the Motion Re Adversary Issues, Waters also argues that the court should deny any judgment that he owes additional penalties and interest with respect to his 1998 tax liabilities because of three affirmative defenses: equitable estoppel, breach of contract, and unjust enrichment. See The Debtor Partially Supports the United States' Mot. for Summ. J. Insofar as Determining Debtor's Original 1998 Income Tax Deficiency of $53,940.39; But Opposes Any Further Assessment of Interest & Penalties . . . ("Opp'n to Mot. Re Adversary Issues") at 2-5, ECF No. 30. However, these defenses were not mentioned in the Debtor's Response and are therefore barred by the Revised Scheduling Order.

1998 tax return from March 18, 1999 to December 7, 2015 and specifies the plaintiff's total tax liability for the 1998 tax year, including accrued interest and penalties, as of November 4, 2019. The Account Transcript reflects that Waters accrued $47,155.98 in interest from the Deficiency Determination Date to November 4, 2019, for a total tax liability of $101,096.37. Interest continues to accrue.

The Account Transcript and its computation of additional interest is explained in the Declaration of Julia Sweeney Regarding 1998 Tax Balance (the "Declaration"), ECF No. 31-1. In the Declaration, Sweeney, an IRS insolvency specialist with access to account information of taxpayers that is maintained on the IRS's computer systems, attests:

> The interest assessments in the attached transcript are all correct. Interest was originally assessed with the tax assessed upon the filing of the return. Part of the interest was abated in accordance with the amended return, and then interest was assessed based on the deficiency assessment. Interest thereafter accrued (and continues to accrue). The rate of interest is set by statute and the computer system automatically calculates the interest as a mathematical function of the tax not yet paid from time to time.

Id. at 6.

In light of the foregoing, the United States has met its initial burden and Waters "must come forward with specific facts showing that there is a genuine issue for trial." Aslanidis v.

-21-

U.S. Lines, Inc., 7 F.3d at 1072. Waters has not filed a statement of facts or pointed to any evidence to create a genuine issue of fact. Therefore, summary judgment is being granted in favor of the United States as to the determination of Waters' 1998 tax liabilities.

### B. **Motion Re Adversary Issues**

With respect to the Motion Re Adversary Issues, all facts set forth in the United States' Rule 56(a)(1) statements have been admitted and there are no genuine issues of material fact. Whether the automatic stay provided for in 11 U.S.C. § 362(a) has been violated is a question of law. See In re Weber, 719 F.3d 72, 75 (2d Cir. 2013); Eskanos & Adler, P.C. v. Leetien, 309 F.3d 1210, 1213 (9th Cir. 2002); In re Froman, 566 B.R. 641, 654 (S.D.N.Y. 2017); In re Adomah, 368 B.R. 134, 137 (S.D.N.Y. 2007).

Waters claims that the IRS willfully violated the automatic stay provisions of the Bankruptcy Code by withholding the claimed overpayments for the 1993, 1994, 1996, 1997, 1999 and 2000 tax years. Specifically, he maintains that "[t]he actions of the IRS in imposing" what he refers to as "indefinite 'V-Freezes,'" which prevent the payment of tax refunds due to a debtor, "without seeking a 'lift of stay' from [the Bankruptcy Court]," constituted "impermissible 'setoffs'" that violated automatic stay provisions of the Bankruptcy Code. Adv. Compl. at 9. The United States asserts

that "there was no offset until after the stay terminated by the entry of the discharge, and a freeze simply does not constitute a stay violation, even if the freeze [is] to preserve a right of setoff to a liability that [was] ultimately . . . conceded or rejected by a Court." Mem. Re Adversary Issues at 11.

The automatic stay, 11 U.S.C. § 362(a), is considered "one of the fundamental debtor protections provided by the bankruptcy laws, designed to relieve the financial pressures that drove debtors into bankruptcy." E. Refractories Co. Inc. v. Forty-Eight Insulations Inc., 157 F.3d 169, 172 (2d Cir. 1998) (internal citations and quotations omitted). "It affords debtors a breathing spell from the collection process and enables them to attempt a repayment or reorganization plan to satisfy existing debt." Id. See also H.R. Rep. No. 595, 95th Cong., 1st Sess. 340 (1977); S. Rep. No. 989, 95th Cong., 2d Sess. 54–55 (1978) ("The automatic stay . . . gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions.").

"Given its fundamental importance to a debtor's bankruptcy case, the automatic stay 'is broadly written and broadly construed.'" In re Grinspan, 597 B.R. 725, 733 (Bankr. E.D.N.Y. 2019) (citing In re NextWave Pers. Commc'ns, Inc., 244 B.R. 253, 271 (Bankr. S.D.N.Y. 2000)); see also In re TS Emp., Inc., 597

B.R. 494, 533 (Bankr. S.D.N.Y. 2019) ("The scope of the stay is broad, encompassing almost any type of formal or informal action taken against the debtor or the property of the bankruptcy estate."); 3 Collier on Bankruptcy ¶ 362.03 (16th ed. 2020) ("The stay of section 362 is extremely broad in scope and, aside from the limited exceptions of subsection (b), applies to almost any type of formal or informal action taken against the debtor. . . . Thus, virtually all acts to collect prepetition claims . . . are stayed.").

The automatic stay is "effective immediately upon the filing of the petition," Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 527 (2d Cir. 1994), and, unless lifted by the court, remains in effect until the case is closed, dismissed, or, if the case is a case under chapter 7 concerning an individual or a case under chapter 9, 11, 12, or 13, a discharge is granted or denied. See 11 U.S.C. § 362(c)(2). "On request of a party in interest and after notice and a hearing," the court may grant relief from the stay "for cause" "by terminating, annulling, modifying, or conditioning [the] stay[.]" 11 U.S.C. 362(d)(1). In light of the automatic stay's importance, however, "[o]nly the court may lift the stay" and "[c]onduct that bypasses the bankruptcy court and violates the automatic stay" is "impermissible." In re Fugazy Exp., Inc., 982 F.2d 769, 776–77 (2d Cir. 1992).

"[A] party seeking damages for violation of the automatic stay must prove the following elements: (1) that a bankruptcy petition was filed, (2) that the debtor is an individual, (3) that the creditor received notice of the petition, (4) that the creditor's actions were in willful violation of the stay, and (5) that the debtor suffered damages." In re Parry, 328 B.R. 655, 658 (Bankr. E.D.N.Y. 2005). "The moving party must prove each of these elements by a preponderance of the evidence." Id. See also In re Grinspan, 597 B.R. 725, 733 (Bankr. E.D.N.Y. 2019); In re Manchanda, No. 16-10222 (JLG), 2016 WL 3034693, at *5 (Bankr. S.D.N.Y. May 19, 2016). Here, there is no dispute with respect to the first, second, and third elements. The parties agree that the automatic stay was known to be in effect at the time the IRS froze the refund of the overpayments claimed by Waters. The court concludes that the United States is entitled to summary judgment because under the circumstances of this case, the IRS did not violate the automatic stay by freezing the refund of the claimed overpayments.

Section 362(a) provides that "the filing of a bankruptcy petition 'operates as a stay, applicable to all entities, of' most actions against the debtor, the debtor's property and any property of the estate." In re Hale, 535 B.R. 520, 523 (Bankr. E.D.N.Y.

2015) (quoting 11 U.S.C. § 362(a)). Waters claims that the IRS violated the following provisions of § 362(a):

> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
>
> . . .
>
> (5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title; [and]
>
> (6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title[.]

11 U.S.C. § 362(a)(1), (5) and (6). See Adv. Compl. at 1 ("[T]he [IRS] . . . is in willful violation of §§ 362(a)(1), (5), and (6)[.]"); Debtor's Opp'n to Mot. Re Adversary Issues at 1.

Section 362(a)(1) is inapplicable here because it stays only an action or proceeding against the debtor that was or could have been instituted before the commencement of the debtor's bankruptcy case, and no such action or proceeding has been alleged or identified by Waters.

Section 362(a)(5) is also inapplicable here because Waters has not identified what lien is alleged to have been created, perfected or enforced by means of the challenged freeze, and no

lien existed until after the stay had been terminated as a result of the discharge.

The creation of a tax lien is governed by the Internal Revenue Code. Under § 6321 of the Internal Revenue Code, when "[a] person liable to pay any tax neglects or refuses to pay the same after demand, the amount . . . shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person." By operation of § 6322 of the Internal Revenue Code, the tax lien imposed by § 6321 "arise[s] at the time the assessment is made and shall continue until the liability for the amount so assessed . . . is satisfied or becomes unenforceable by reason of lapse of time." 26 U.S.C. § 6322. Thus, a tax lien is created upon assessment and nonpayment of a tax liability. See Estate of Friedman v. Cadle Co., Case No. 3:08CV488 (RNC), 2009 U.S. Dist. LEXIS 130505, *7 (D. Conn. Sep. 9, 2009). Assessment[7] and demand, in turn, occur after the IRS issues a required notice of tax deficiency to the taxpayer, see 26 U.S.C. §§ 6212 and 6213, and the taxpayer does not contest the deficiency determination within 90 days from the issuance of the notice. See 26 U.S.C. § 6213(c) ("If the taxpayer does not file a

---

[7] "Assessment of tax . . . consists of no more than the ascertainment of the amount due and the formal entry of that amount on the books of the secretary." United States v. Dixieline Fin., Inc., 594 F.2d 1311, 1312 (9th Cir. 1979).

petition with the Tax Court within the time prescribed in subsection (a) [i.e., within 90 days], the deficiency, notice of which has been mailed to the taxpayer, shall be assessed, and shall be paid upon notice and demand from the Secretary."); United States v. Reece, 2001 U.S. Dist. LEXIS 24496, *14 (W.D.N.Y. Aug. 14, 2001) ("[N]o assessment of the tax by the IRS is permitted during the 90-day period immediately following the mailing of the deficiency notice."), modified, No. 99-cv-415S, 2002 U.S. Dist. LEXIS 9280 (W.D.N.Y. Mar. 25, 2002).

Waters has not identified what lien he contends was created, perfected or enforced by the IRS's freeze. The court can find in the record only one lien that was placed on Waters' assets as a result of his tax liabilities. On February 22, 2005, the IRS issued a Notice of Deficiency to Waters with respect to his 1998 and 2001 tax returns. A delegate of the Secretary made an assessment against Waters for additional federal income tax owed with respect to the 1998 tax year on December 5, 2005. A lien was then placed on Waters' assets due to his outstanding tax liability for the 1998 tax year on November 6, November 13, and November 20, 2015. See Account Transcript at 1-2. Thus, a lien was not created until several years after the stay in this case had been terminated as a result of the discharge on May 24, 2005. The IRS's freeze, then,

bore no legal or factual relationship to the creation of the lien and cannot serve as a basis for liability under § 362(a)(5).

Section 362(a)(6) stays "any act to collect, assess, or recover a claim against the debtor" that arose prepetition. It is intended to "prevent[] creditors from attempting in any way to collect a prepetition debt . . . . [as] [i]nexperienced, frightened, or ill-counseled debtors may succumb to suggestions to repay notwithstanding their bankruptcy. This provision prevents evasion of the purpose of the bankruptcy laws by sophisticated creditors." H.R. Rep. No. 595, 95th Cong., 1st Sess. 340 (1977). A "claim" is broadly defined as any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured[.]" 11 U.S.C. § 101(5). It is undisputed that the IRS had claims against Waters within the meaning of § 101(5) that arose prepetition -- namely, Waters' contested 1988, 1990, 1991, 1992 and 1995 tax liabilities.[8]

"In order to constitute a violation of § 362(a)(6), conduct must be of a nature that '(1) could reasonably be expected to have a significant impact on the debtor's determination as to whether to repay, and (2) is contrary to what a reasonable person would

---

[8] As previously noted, the IRS withdrew its claims for the 1988 through 1990 and 1992 tax years. See Mem. Re Adversary Issues at 9.

consider to be fair under the circumstances.'" In re Clark, No.
13-10904, 2014 Bankr. LEXIS 749, *3 (D. Vt. Feb. 26, 2014)
(quoting In re Briggs, 143 B.R. 438, 453 (Bankr. E.D. Mich. 1992).

The United States argues that a setoff, and by extension a
freeze to preserve a right of setoff, cannot constitute an act to
collect, assess, or recover a claim:

> Section 362(a)(6) prohibits acts to collect, assess, or
> recover a claim "that arose before the commencement of the
> case" (i.e., a prepetition claim). . . . As for withholding
> refunds to preserve a right of setoff against a prepetition
> claim, even a fully completed setoff does not "collect,
> assess, or recover" a claim. First, as held in In re Taalib-
> [D]in, Civil No. 16-cv-1194, 2017 WL 3447903 (E.D. Mich.
> 2017), "characterizing a setoff as an 'act to collect, assess,
> or recover' would make the following subsection, 11 U.S.C. §
> 362(a)(7), superfluous," thus violating "[o]ne of 'the most
> basic interpretive canons." Id. at *3. As further observed in
> Taalib-[D]in, the Supreme Court has held that a setoff does
> not "collect" anything because it is instead the assertion of
> a defense to the other party's claim to collect a debt from
> the party asserting setoff. Id. citing Citizens Bank v.
> Strumpf, 516 U.S. 16 (1995). For the same reason, a setoff
> does not "recover" anything that the party effectuating the
> setoff does not already have in its possession.

Combined Reply at 15.

The court agrees with the United States that the act of
freezing the refund of Waters' claimed overpayments was not an
"actual setoff". See Mem. Re Adversary Issues at 11. ("[T]he actual
setoffs were made after the discharge[.]"). "The right of setoff
(also called 'offset') allows entities that owe each other money
to apply their mutual debts against each other, thereby avoiding

-30-

'the absurdity of making A pay B when B owes A.'" <u>Citizens Bank v. Strumpf</u>, 516 U.S. 16, 18 (1995) (quoting <u>Studley v. Boylston Nat. Bank</u>, 229 U.S. 523, 528 (1913)); <u>see also</u> <u>Gratiot v. United States</u>, 40 U.S. 336, 370 (1841) (holding that the right of setoff is a "common right, which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him."). A setoff occurs within the meaning of the Bankruptcy Code when a creditor "inten[ds] permanently to settle accounts." <u>Strumpf</u>, 516 U.S. at 19. "A requirement of such an intent is implicit in the rule followed by a majority of jurisdictions addressing the question, that a setoff has not occurred until three steps have been taken: (i) a decision to effectuate a setoff, (ii) some action accomplishing the setoff, and (iii) a recording of the setoff." <u>Id.</u> (citing cases). Here, the IRS did not evidence an intent permanently to settle accounts until after the stay was no longer in effect. Only then did the IRS credit the withheld overpayments to Waters' 1991 and 1995 tax liabilities and record the setoff.

The court also agrees with the reasoning in <u>In re Taalib-Din</u> as to why the exercise of a right of setoff does not fall within the scope of § 362(a)(6), i.e. such an interpretation of § 362(a)(6) would render superfluous § 362(a)(7).

But the court is not persuaded that, by extension, putting in place a freeze to preserve a right of setoff can never constitute an act to collect or recover a claim against a debtor. Whether a fully completed setoff collects or recovers a claim is a very different question. The court finds helpful the analysis in three cases where the IRS placed a freeze on a tax refund.

In United States v. Norton, 717 F.2d 767 (3rd Cir. 1983), shortly after the debtors filed a Chapter 13 bankruptcy petition, the IRS withheld a portion of a tax overpayment that was due the debtors.  The IRS maintained that by withholding a portion of the overpaid taxes it had not violated the automatic stay but rather, simply "'frozen' the debtors' account so as to preserve its setoff rights against the Nortons." Norton, 717 F.2d at 771. The court concluded that the IRS was in violation of the automatic stay, reasoning:

> The Government argues that since the IRS did not credit the Nortons' overpayment against their delinquent tax liabilities, the IRS has not set off the Government's claim against the Nortons' debt.  Rather the IRS has simply frozen the Nortons' account to preserve its setoff rights and, thus, has not violated the automatic stay.
>
> . . . .
>
> If a creditor could circumvent the automatic stay simply by delaying the entry of a setoff or credit in its books, it could hold the funds until the case was closed and then deposit them into its own bank account. By the

> unilateral action of one creditor, these funds would become
> unavailable for distribution to other creditors or for use by
> the debtor in a Chapter 13 plan, thus making it that much
> less likely that the debtor could be rehabilitated.

Id. at 771-21, 733.

In re Holden, 217 B.R. 161 (Bankr. D. Vt. 1997), involved a motion to dismiss in a case where the Bankruptcy Court had confirmed a Chapter 13 plan that provided for full payment of taxes owed the IRS. The Holdens experienced a temporary reduction in income and fell behind in their monthly plan payments to the Chapter 13 trustee. When the debtors filed for an IRS rapid tax refund, the IRS "imposed and maintained a freeze on the Holdens' entire tax refund for the apparent purpose of coercing payment of a prepetition debt that already was scheduled to be fully paid under the terms of the confirmed Chapter 13 plan." Id. at 164. An IRS employee told one of the debtors that if they agreed to pay their prepetition debt from the tax refund, the IRS would send them the balance of the refund. The court rejected the argument by the IRS that its administrative freeze was similar to the freeze imposed by the bank in Strumpf:

> [T]he Supreme Court found "that the mere retention of property
> subject to a right of setoff for the purpose of preserving
> the right does not violate the automatic stay, at least so
> long as the creditor acts diligently in seeking relief from
> stay to enforce its right." Collier para. 553.08[2] at 553-
> 86. . . . .

Here, the IRS maintains its administrative freeze is similar to the freeze imposed by the Bank in Strumpf and therefore does not constitute a setoff initiated in violation of the automatic stay. However,

> [w]hile clarifying an important question, the Court's decision in Strumpf did not lay to rest all of the issues surrounding the practice of the administrative freeze. For example, the Court expressly did not take up the contention that the administrative hold was wrongful because it exceeded the lawful amount of the bank's setoff right. Nor did the Court consider the issue of how long a bank may "temporarily" maintain the administrative hold without seeking relief from stay. The prudent course would be to seek relief from stay on an immediate basis.

Collier para. 553.06[3] at 553-70 (footnote omitted).

This the IRS did not do. Instead, the Holdens allege the IRS deprived them of their funds until they agreed to pay a debt which was already addressed in their bankruptcy plan. Under Strumpf, a temporary freeze on funds in which a creditor has a good faith basis for asserting a right of setoff, and which is promptly followed by a request for relief from stay, maintains the status quo and therefore may not violate the automatic stay. See In re Tillery, 179 B.R. 576, 581 (Bankr.W.D.Ark.1995). However, accepting as true the facts alleged by the Holdens, the IRS did not simply maintain the status quo. It utilized an open-ended "administrative freeze" to coerce an agreement and to secure the payment of a debt, without seeking prior approval from the Bankruptcy Court. Moreover, on its face, the IRS's withholding of $2050 to ostensibly secure collection of $184 was unfair and apparently not in good faith.

In re Holden, 217 B.R. at 165-66.

In In re Burrow, 36 B.R. 960 (Bankr. D. Utah 1984), the IRS office followed a procedure under which a freeze code was placed "on the IRS computer upon receipt of a notice of a bankruptcy petition." Id. at 962. The debtors' 1982 tax return showed an

-34-

overpayment.  The court concluded that the IRS had no setoff rights in the tax refund.  It reasoned that

> [e]ven though a right to setoff 1982 tax overpayments would
> have arisen under Section 6402(a) absent bankruptcy, that
> right never came into existence because of the automatic
> stay and the order confirming the debtors' plan. . . . .
> Section 553(a) does not apply to this case.  While the IRS
> had a claim against the debtors that arose before the
> commencement of the case, the 1982 tax refund was not a
> debt owed to the debtors at the commencement of the case.

Id. at 962, 964. The court also concluded that "holding the refund for collection was also an act to collect or recover a debt within the meaning of Section 362(a)(6)." Id. at 964.

As noted above, inexperienced, frightened, or ill-counseled debtors may succumb to suggestions to repay debt not-withstanding their bankruptcy, and § 362(a)(6) is intended to prevent creditors from attempting in any way to collect prepetition debts. In addition, "the automatic stay is broadly written and broadly construed". In re Grinspan, 597 B.R. at 733 (internal quotation marks and citation omitted). Consistent with the intent behind § 362(a)(6), the circumstances in Norton, In re Holden and In re Burrow illustrate that administrative holds or "freezes" by creditors, including the IRS, can under certain circumstances constitute an act to collect or recover on a claim. On the other hand, Strumpf illustrates that an administrative hold or "freeze" is not necessarily a violation

of the automatic stay. The court concludes that whether an administrative hold or "freeze" is an act to collect or recover on a claim for purposes of § 362(a)(6) depends on the particular facts and circumstances.

In In re Holden, the court found that the IRS did not simply maintain the status quo -- as did the bank in Strumpf -- but, rather, used an administrative freeze to go beyond maintaining the status quo and secure payment of a debt. Going beyond maintaining the status quo in such circumstances to secure payment of a debt can fairly be characterized as conduct of a nature that "(1) could reasonably be expected to have a significant impact on the debtor's determination as to whether to repay, and (2) is contrary to what a reasonable person would consider to be fair under the circumstances." In re Clark, No. 13-10904, 2014 Bankr. LEXIS at *3. Consequently, such conduct constitutes an act to collect or recover a claim.

Here, the circumstances surrounding the refusal by the IRS to refund the claimed overpayments show that IRS's conduct was not of a nature that could be reasonably expected to have a significant impact on Waters' determination as to whether to pay the taxes he owed.  Nor was it contrary to what a reasonable person would consider to be fair under the circumstances. Rather, it simply maintained the status quo.

-36-

Under the Stipulation, which was an order of the Bankruptcy Court, all taxes shown as being due on Waters' filed tax returns for the years 1993 through 1996, and all taxes shown as being due on Waters' filed tax returns for the years 1997 through 2000 and any estimated income taxes due for 2001, were required to be paid from the Escrowed Funds. In addition, under the Tax Payment Order, which was also an order of the Bankruptcy Court, Waters had a right to file a claim for a refund of penalties only, as well as contest the assessment, validity and appropriateness of the penalties.  Waters, however, filed amended tax returns claiming refunds for most of the taxes that were paid pursuant to the Tax Payment Order, and the IRS examiner assigned to review the amended returns, who was unaware of the Tax Payment Order, agreed with many of the adjustments claimed by Waters on the amended returns and scheduled overpayments on the tax accounts maintained on the IRS's computer systems. Because all the payments made pursuant to the Tax Preparation Order were made from the Escrowed Funds, any amounts that were overpayments that could be refunded also originally came from the Escrowed Funds. Thus, under the terms of the Stipulation any such overpayments were required to be applied to Waters' tax liabilities, as opposed to refunded to Waters. If the United States had distributed the amount of the claimed overpayments to

-37-

Waters, it would have been entitled to an immediate return of those amounts by Waters so that they could be deposited as part of the Escrowed Funds. Consequently, the freeze here was a step required to prevent circumvention by Waters of the Stipulation and the Tax Payment Order and ensure that, as provided in the Stipulation, the Escrowed Funds be used to pay the tax liabilities of Waters and the bankruptcy estate.

Under these circumstances, the act of the IRS in freezing refunds of the overpayments claimed by Waters merely maintained the status quo and did not constitute an act to collect, assess, or recover a claim against Waters in violation of § 362(a)(6). Therefore, summary judgment is being granted in favor of the United States on the issue of whether the IRS violated the automatic stay provisions of the Bankruptcy Code.

## IV.   CONCLUSION

For the reasons set forth above, the United States' Motion for Summary Judgment on 1998 Tax Issues (ECF No. 25) and the United States' Motion for Summary Judgment on Issues Remaining in Withdrawn Adversary Proceeding (ECF No. 26) are hereby GRANTED.

The Clerk shall enter judgment accordingly and close this case.

It is so ordered.

Dated this 31st day of March 2021, at Hartford, Connecticut.

```
                                   /s/AWT
                              Alvin W. Thompson
                       United States District Judge
```